CYNTHIA ESTELLE BOOKER-DOUGLAS, Administratrix of the Estate of LEROY DOUGLAS, JR., Deceased Employee, Plaintiff v. J & S TRUCK SERVICE, INC., Employer, LIBERTY MUTUAL INSURANCE COMPANY, Carrier, Defendants

No. COA05-1026

(Filed 20 June 2006)

**Workers' Compensation— death benefits—causation**

  The Industrial Commission did not err by finding no causal relationship between a truck driver's compensable injury, which left him quadriplegic, and his subsequent death from an enlarged heart.

Appeal by plaintiff from an opinion and award filed 26 May 2005 by the North Carolina Industrial Commission. Heard in the Court of Appeals 16 March 2006.

*Law Offices of Kathleen G. Sumner, by Kathleen G. Sumner, for plaintiff appellant.*

*Hedrick Eatman Gardner & Kincheloe, L.L.P., by Tonya D. Davis and Jeffrey A. Doyle, for defendant appellees.*

McCULLOUGH, Judge.

Cynthia Booker-Douglas appeals from an opinion and award of the North Carolina Industrial Commission denying her claim for death benefits following the death of her husband. We affirm the challenged opinion and award.

<u>Facts</u>

On 19 September 1985, decedent Leroy Douglas, Jr., was employed as a truck driver for defendant J & S Truck Service. On that

BOOKER-DOUGLAS v. J & S TRUCK SERV., INC.

[178 N.C. App. 174 (2006)]

particular date, Douglas was assigned to a long distance drive with at least one other driver. While Douglas was asleep in the passenger seat of the truck, the other driver lost control of the vehicle. The ensuing accident caused irreparable injury to Douglas' spinal cord, and rendered him quadriplegic. From the date of Douglas' accident through 6 October 1994, he received temporary total disability benefits. He thereafter received permanent total disability benefits until his death. Douglas died on 6 April 2001 of sudden cardiac death, and the autopsy revealed that he had hypertrophic heart disease, or an "enlarged heart."

In August of 1991, Cynthia Booker-Douglas began working part-time as Douglas' certified nursing assistant. In 1995, when Douglas moved from High Point to Greensboro, Booker-Douglas became his sole care-giver. She provided twenty-four-hour care for Douglas, for which she was paid $1,517.40 per week by J & S' workers' compensation carrier. She and Douglas were married on 8 November 1997.

Following Douglas' death, Booker-Douglas filed a claim on behalf of his estate with the North Carolina Industrial Commission. Booker-Douglas' claim alleged that Douglas' 19 September 1985 spinal cord injury caused the hypertrophic heart disease which resulted in his death. Booker-Douglas sought death benefits, and burial expenses.

At a hearing before the Industrial Commission, J & S Truck Service and its workers' compensation carrier, Liberty Mutual Insurance (hereinafter "defendants"), presented evidence tending to show that Douglas' fatal hypertrophic heart disease was not caused by his compensable quadriplegia. According to the testimony of Dr. Sewell Dixon, an expert cardiovascular surgeon retained by defendants, hypertrophic heart disease is an enlargement of the heart muscle, resulting from the heart having to work harder to pump blood throughout the body. According to Dr. Dixon, it also can be caused by cardiomyopathy, an abnormality in the muscle of the heart which causes the rest of the heart to work harder to compensate.

Booker-Douglas averred that Douglas' heart was enlarged due to his quadriplegia; however, Dr. Dixon testified that, with quadriplegics, physical inactivity generally causes the heart to atrophy, because the body's muscles require less oxygen, not more. Dr. Dixon stated that there are two ways that quadriplegia could be related to sudden cardiac death. One way is if the death was the result of a pulmonary embolism. A pulmonary embolism is when a blood clot forms in the leg and travels up through the heart and causes a sudden obstruction

of blood flow to the lungs. Pulmonary embolisms are common in people who are inactive because blood clots are more likely to form in areas with decreased blood circulation, a common result of inactivity. However, the pathologist performing Douglas' autopsy found no evidence of a pulmonary embolism.

According to Dr. Dixon, another way quadriplegia could cause sudden cardiac death is if a decedent had significant coronary artery disease. There is a high correlation between people who are obese, have high blood pressure, smoke, and do not get enough exercise, and coronary artery disease. However, there was no evidence that Douglas had coronary heart disease.

Booker-Douglas averred that Douglas had lung and heart problems prior to his death that went undiagnosed and that these problems caused his enlarged heart. This averment was based on an autopsy that revealed that Douglas had pulmonary congestion and edema, *i.e.*, fluid in the lungs. Booker-Douglas claimed that fluid in Douglas' lungs would have caused the heart to work harder, and therefore become enlarged. When examined on this point, Dr. Dixon explained that an enlarged heart is usually the cause, not the result, of pulmonary edema. Dr. Dixon testified that Douglas' pulmonary congestion or edema was most likely caused by the attempts to resuscitate Douglas.

A Deputy Commissioner with the Industrial Commission denied Booker-Douglas' claim on 27 May 2004. On an appeal by Booker-Douglas, the Full Commission (hereinafter "the Commission") also denied Booker-Douglas' claim, based on a finding that Douglas died of a fatal arrythmia due to an enlarged heart that was caused by cardiomyopathy, and that there was no causal relationship between the cardiomyopathy and Douglas' quadriplegia or his compensable injury.

Booker-Douglas now appeals to this Court.

### Standard of Review

The standard of review for an opinion and award of the North Carolina Industrial Commission is "(1) whether any competent evidence in the record supports the Commission's findings of fact, and (2) whether such findings of fact support the Commission's conclusions of law." *Creel v. Town of Dover*, 126 N.C. App. 547, 552, 486 S.E.2d 478, 480 (1997). "The Commission's findings of fact are conclusive on appeal if supported by competent evidence, notwithstanding evidence that might support a contrary finding." *Hobbs v. Clean*

**BOOKER-DOUGLAS v. J & S TRUCK SERV., INC.**

[178 N.C. App. 174 (2006)]

*Control Corp.*, 154 N.C. App. 433, 435, 571 S.E.2d 860, 862 (2002). In determining the facts of a particular case, "the Commission is the sole judge of the credibility of the witnesses and the weight accorded to their testimony." *Effingham v. Kroger Co.*, 149 N.C. App. 105, 109-10, 561 S.E.2d 287, 291 (2002) (citations omitted). "This Court reviews the Commission's conclusions of law *de novo.*" *Deseth v. LensCrafters, Inc.*, 160 N.C. App. 180, 184, 585 S.E.2d 264, 267 (2003).

### Legal Discussion

The dispositive issue on appeal is whether the Commission erred by determining that Douglas' death of hypertrophic heart disease was not causally related to the quadriplegia which resulted from his 1985 compensable injury. We discern no error in the Commission's determination.

Workers' Compensation death benefits are governed, as follows, by section 97-38 of the North Carolina General Statutes:

> If death results proximately from a compensable injury or occupational disease . . . the employer shall pay or cause to be paid, subject to the provisions of other sections of this Article, weekly payments of compensation equal to sixty-six and two-thirds percent (66 2/3%) of the average weekly wages of the deceased employee at the time of the accident . . . and burial expenses . . . .
>
> . . . .
>
> When weekly payments have been made to an injured employee before his death, the compensation to dependents shall begin from the date of the last of such payments. Compensation payments due on account of death shall be paid for a period of 400 weeks from the date of the death of the employee; provided, however, after said 400-week period in case of a widow or widower who is unable to support herself or himself because of physical or mental disability as of the date of death of the employee, compensation payments shall continue during her or his lifetime or until remarriage . . . .

N.C. Gen. Stat. § 97-38 (2005). For death benefits to be awarded under this statute, a compensable injury must be the proximate cause of the employee's death. *Id.*

In the instant case, there was evidence that Douglas' compensable quadriplegia was not the cause of his death from hyper-

trophic heart disease. Specifically, Dr. Dixon offered the following deposition testimony:

[DEFENSE COUNSEL]: . . . [D]o you have an opinion to a reasonable degree of medical certainty as to whether or not there's any causal relationship between Mr. Douglas' enlarged heart and cardiomyopathy and his quadriplegia?

[DR. DIXON]: I don't see how you can construct a logical relationship, if that answers the question properly, and I think it does. My—my medical opinion is that there's not a relationship between quadriplegia and a cardiomyopathy.

[DEFENSE COUNSEL]: And what is your opinion with respect to whether or not there's a causal relationship between quadriplegia and an enlarged heart?

[DR. DIXON]: I don't think there is a causal relationship. The literature, in fact, says just the reverse occurs, that the heart would be—tend to be smaller, not enlarged.

On appeal, Booker-Douglas makes several arguments as to why, in her view, the Commission could not rely upon Dr. Dixon's testimony to find and conclude that there was no causal nexus between Douglas' quadriplegia and death and why the Commission was compelled to find that there was such a causal nexus. We find these arguments unpersuasive.

1.

Booker-Douglas first contends that Dr. Dixon's testimony was insufficient to establish the lack of a causal nexus between Douglas' quadriplegia and his death of heart disease because the doctor's testimony was speculative under the standard established by *Holley v. ACTS, Inc.*, 357 N.C. 228, 581 S.E.2d 750 (2003). We disagree.

In *Holley*, our Supreme Court held that an award of compensation in a case involving a complex medical question must be premised upon an expert's non-speculative opinion that a work-related accident caused an employee's injury. *Id.* at 234, 581 S.E.2d at 754. In such cases, if an expert's opinion as to causation is based on speculation, his opinion is not competent evidence which supports a finding that an accident at work caused the employee's injury. *Id.*; *see also Young v. Hickory Bus. Furn.*, 353 N.C. 227, 233, 538 S.E.2d 912, 916 (2000). However, medical certainty from the expert is not required, and even

if an expert is unable to state with certainty that there is a nexus between an event and an injury, his testimony relating the two is at least some evidence of causation if there is additional evidence which establishes that the expert's testimony is more than conjecture. *See Singletary v. N.C. Baptist Hosp.*, —— N.C. App. ——, ——, 619 S.E.2d 888, 893-94 (2005); *Adams v. Metals USA*, 168 N.C. App. 469, 482, 608 S.E.2d 357, 365, *aff'd per curiam*, 360 N.C. 54, 619 S.E.2d 495 (2005).

In the instant case, our review of the record reveals that Dr. Dixon's testimony concerning causation was not speculative. Rather, his opinion was unequivocal as to a lack of a causal link between Douglas' compensable quadriplegia and his death of heart disease. Further, Dr. Dixon stated that his opinion was based on his survey of medical literature. Accordingly, the doctor's testimony was not incompetent under our Supreme Court's decision in *Holley*.

<u>2</u>.

Booker-Douglas further contends that Dr. Dixon's testimony could not be considered by the Commission because he was paid a fee which was outside of the fee schedule established by the Commission for payment to medical providers. This contention also lacks merit.

Booker-Douglas' argument concerning Dr. Dixon's fee is premised upon her interpretation of sections 97-26(a) and (b), 97-90(a), and 97-91 of the North Carolina General Statutes. Section 97-26 provides, in pertinent part, as follows:

(a) Fee Schedule.—The Commission shall adopt a schedule of maximum fees for medical compensation, except as provided in subsection (b) of this section, and shall periodically review the schedule and make revisions pursuant to the provisions of this Article.

The fees adopted by the Commission in its schedule shall be adequate to ensure that (i) injured workers are provided the standard of services and care intended by this Chapter, (ii) providers are reimbursed reasonable fees for providing these services, and (iii) medical costs are adequately contained.

. . . .

(b) Hospital Fees.—Each hospital subject to the provisions of this subsection shall be reimbursed the amount provided for in

this subsection unless it has agreed under contract with the insurer, managed care organization, employer (or other payor obligated to reimburse for inpatient hospital services rendered under this Chapter) to accept a different amount or reimbursement methodology.

N.C. Gen. Stat. § 97-26 (2005). Section 97-90(a) states that

[f]ees for attorneys and charges of health care providers for medical compensation . . . shall be subject to the approval of the Commission; but no physician or hospital or other medical facilities shall be entitled to collect fees from an employer or insurance carrier until he has made the reports required by the Commission in connection with the case.

N.C. Gen. Stat. § 97-90(a), (b) (2005). Section 97-91 is merely a legislative instruction to the Commission that it should determine all workers' compensation issues not settled by valid agreement of the parties.

Read closely and in context, the foregoing provisions are not applicable to the fee paid to Dr. Dixon. Sections 97-26 and 97-90(a) govern payment for "medical compensation," which is defined by section 97-2(19) as

medical, surgical, hospital, nursing, and rehabilitative services, and medicines, sick travel, and other treatment, including medical and surgical supplies, as may reasonably be required to effect a cure or give relief and for such additional time as, in the judgment of the Commission, will tend to lessen the period of disability[.]

N.C. Gen. Stat. § 97-2(19) (2005). In the instant case, Dr. Dixon was retained as an expert witness. He did not provide medical services to Douglas. Expert witness fees are not mentioned in section 97-26, 97-90(a), or 97-2(19). Further, it would be inappropriate to interpret these provisions as being applicable to expert witness fees, given that the purpose of the provisions is to ensure that injured employees receive medical treatment, *see* N.C. Gen. Stat. § 97-26(a), and given that, in some circumstances, medical providers are permitted to negotiate a higher fee with a workers' compensation carrier, *see* N.C. Gen. Stat. § 97-26(b). Accordingly, Dr. Dixon's testimony was not required to be excluded by the Commission because of the fee paid to the doctor.

**BOOKER-DOUGLAS v. J & S TRUCK SERV., INC.**

[178 N.C. App. 174 (2006)]

3.

Booker-Douglas also challenges the Commission's causation determination on the ground that the Commission erroneously failed to apply a legal presumption that Douglas' death was caused by his compensable injury. In support of her contention that such a presumption exists, Booker-Douglas notes that a presumption of compensability arises "where the evidence shows that death occurred while the decedent was within the course and scope of employment, but the medical reason for death is not adduced." *Pickrell v. Motor Convoy, Inc.*, 322 N.C. 363, 369, 368 S.E.2d 582, 585-86 (1988).

The instant case does not involve a situation where an employee died within the course and scope of his employment, and Booker-Douglas has cited no cases which apply the presumption, from which she seeks to benefit, to circumstances analogous to those presented in the instant case. Further, as already indicated, there was evidence from which the Commission could find and conclude that Douglas' death was not caused by his quadriplegia and, therefore, was not causally related to his 1985 compensable injury. Accordingly, even assuming *arguendo* that Booker-Douglas was entitled to a presumption of compensability, the Commission was not precluded from denying compensation in the instant case.

4.

Booker-Douglas further asserts that the Commission should have applied a "chain of causation test" to determine that Douglas' death was caused by his work-related quadriplegia. Booker-Douglas admits that the cases applying this test involved employees who had committed suicide, and she provides an entirely unprepossessing argument as to why this rule should be applied in the instant case. As already indicated, the Commission was not precluded from finding and concluding that Douglas' death was unrelated to the injuries he sustained in the 1985 work-related accident.

5.

The foregoing analysis makes it unnecessary for us to address Booker-Douglas' claims regarding the level of benefits that she should receive.

The assignments of error are overruled. The Commission's opinion and award is

Affirmed.

Judges TYSON and LEVINSON concur.